# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

DORIS GREEN,                              )
                                         )
      Plaintiff,                         )
                                         )
    vs.                                   )      Case No. 4:10CV328MLM
                                         )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security           )
                                         )
      Defendant.                         )

## MEMORANDUM OPINION

This is an action brought pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et. seq. filed by Plaintiff Doris Green ("Plaintiff"). Plaintiff filed a brief in support of her Complaint. Doc. 13. Defendant filed a brief in support of the Answer. Doc 16. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 7.

## I.
## PROCEDURAL HISTORY

Plaintiff filed an application for benefits, alleging an disability onset date of March 9, 2007, Tr. 80-87. On August 22, 2007, Plaintiff's claim was denied. Tr. 45-52. On August 29, 2007, Plaintiff filed a Request for Hearing before an Administrative Law Judge ("ALJ"), which hearing was held on April 7, 2009. Tr. 20-39, 53-54. By decision dated June 2, 2009, the ALJ found that Plaintiff was not disabled through the date of the decision. Tr. 7-19. The Appeals Council declined review on January 13, 2010. Tr. 1-4. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## MEDICAL RECORDS

David Brown, M.D., reported, on March 23, 2006, that Plaintiff's hypertension and diabetes were uncontrolled; that, in regard to Plaintiff's hypertension, Dr. Brown was "re-emphasizing" diet, exercise and weight reduction; that, in regard to her diabetes, Dr. Brown "re-emphasized the need for better dietary control"; that her asthma, degenerative arthritis, sleep apnea, and GERD were stable; that, based on blood tests, her hypercholesterolemia was "reasonably well controlled"; that her heart had regular rhythm; that her "first new problem" was that Plaintiff was feeling down over the last few months"; that she thought she could bounce out of it but she [did] not"; that she was given Cymbalta for her depression; that, in regard to congestive heart failure, there was "no evidence by history or exam of exacerbation"; that, in terms of sleep apnea, Plaintiff "seem[ed] to be sleeping fairly well, tolerating mask set up, and [felt] rested in the morning"; that Plaintiff had regular heart rhythm; that she had normal gait and could sit and stand without difficulty; that her lungs were clear, and that Plaintiff was well developed and in no distress. Tr. 268-69.

St. John's Mercy Medical Center records reflect that Plaintiff presented to the emergency room on May 9, 2006, with lower back pain. The Nursing Record of this date states that Plaintiff said she had not suffered an injury and that the pain was radiating down her right leg with tingling in her fourth toe. Tr. 201-202.

Dr. Brown reported, on May 11, 2006, that Plaintiff presented complaining of low back pain; that Dr. Brown diagnosed low back pain with radiculopathy; that Plaintiff was prescribed Prednisone; that Plaintiff's hypertension was "uncontrolled"; that her asthma was stable; that Plaintiff's sleep apnea was stable with her regimen of exercise, weight reduction, and CPAP; that Plaintiff's

depression was stable with her regime; that her diabetes and hypercholesterolemia were under reasonable control with her regime, including diet, exercise, and weight control; that there was no evidence of exacerbation of congestive heart failure by history or exam; that, pursuant to a foot exam, pulses and sensation in the dorsal and volvar aspect were present; that, in regard to her musculoskeletal system, Plaintiff had "a little palpable tenderness"; that Plaintiff's lungs were clear; that her heart had regular rhythm; and she was well developed and in no distress. Tr. 264-65.

The impression from a May 18, 2006 MRI of the lumbar spine was that Plaintiff had sacralization of L5 and a new right-sided focal disc protrusion. Tr. 278.

Records of Kongwood P. Yoon, M.D., reflect that he saw Plaintiff on June 21, 2006, for back pain. Dr. Yoon reported on this date that Plaintiff said she had lower back pain for about two months and that during the prior four weeks, it had been getting a little better; that Plaintiff also reported having pain in her right heel; that Plaintiff had a positive straight leg raising test on the right, decreased pin prick of the right heel, and S1 radiculpathpy; and that Plaintiff had an MRI which showed a herniated nucleus pulposus at L5-S1 on the right. Tr. 157.

A laboratory report, dated July 5, 2006, reflects that Plaintiff's HGB, HCT, Sodium, K Plasma, Chloride, $CO_2$, Glucose, Calcium, and Creatinine were within normal range. Tr. 161.

Dr. Yoon reported on July 11, 2006, Plaintiff had some relief from pain with pain management; that Plaintiff's pain persisted; that Plaintiff helped disabled people at home; that Plaintiff smoked a half a pack of cigarettes a day; that, pursuant to a physical exam, Plaintiff was in no acute distress, her chest was clear, her heart had a regular rate and rhythm, her straight leg raising test was positive on the right side at fifty degrees and she had decreased pin prick sensation in the right heel; and that Plaintiff was to have L5-S1 diskectomy on the right. Tr. 166-67.

Records reflect that, on July 11, 2006, Plaintiff had a right L5-S1 diskectomy; that there were no complications; and that Plaintiff was discharged with a follow-up scheduled on July 13, 2006. Tr. 194.

Dr. Yoon's records reflect that he saw Plaintiff on July 26, 2006, and that Plaintiff reported she felt better on this date. Tr. 158.

On August 15, 2006, Daniel W. Whitebread, M.D., diagnosed the Plaintiff with whiplash syndrome with "significant pain in her neck, back, and shoulders," and "significant muscle spasms," after a car accident on August 7, 2006. Tr. 260-61.

Plaintiff was seen by Dr. Brown, on August 30, 2006, for follow-up to assess whether her multiple medical problems were under reasonable control. Records of this date reflect that the Plaintiff was in a "tizzy" because she had not been feeling well; that she had recently been in a car accident; that she was suffering from a hyperextension injury in her neck and a trapezius muscle spasm; that she had not been sleeping; that "Vicodin minimally cover[ed] it"; that Plaintiff's hypertension was uncontrolled; that, in terms of hypertension, Plaintiff denied chest pain or pressure, had no palpitations, denied shortness of breath, and had no pedal edema; that her asthma was stable; that Plaintiff's diabetes was under "reasonable control"; that, in regard to her diabetes, Plaintiff denied excessive thirst and she had no symptomatic low blood sugar episodes; that her chronic renal failure was stable; hypercholesterolemia was "reasonably well controlled"; that her GERD was "stable by symptoms and exam"; that, in regard to GERD, Plaintiff denied heartburn, indigestion, and difficulty swallowing; and that Plaintiff had muscle spasms. Tr. 256-57.

On September 18, 2006, Dr. Yoon's records reflect that the Plaintiff was seen for follow-up for back pain following an automobile accident; that Plaintiff said her back pain gradually worsened; and that Plaintiff's leg pain resolved in July. Tr. 159.

A report from an MRI of the lumbar spine performed on October 2, 2006, states that the impression included a post-surgical scar, "mild right L4-5 neural foraminal narrowing," and "sacralized L5 with hypoplastic L5-SI disk space." Tr. 165.

Dr. Brown reported, on October 14, 2006, that "a couple of weeks ago [Plaintiff] had a little suicidal ideation but it was brief"; that Dr. Brown prescribed Paxil to address Plaintiff's depression; that Plaintiff said she was "living off ice cream and soda," which was "not beneficial for her diabetes"; that Plaintiff's diabetes and hypertension were as "uncontrolled"; that Dr. Brown was "re-emphasiz[ing] the need for better dietary compliance, exercise and weight control" in regard to Plaintiff's diabetes and hypertension; that Plaintiff complained about gout in her hands, wrists, elbows, feet; that, in regard to Plaintiff's sleep apnea, Plaintiff said that she was sleeping well, that she was tolerating the CPAP machine, and that she was not falling asleep in the day or experiencing any shortness of breath or chest pain; that Plaintiff's GERD was stable by symptoms and exam; that, in regard to her GERD, Plaintiff denied heartburn, indigestion, or difficulty swallowing; that, in regard to her asthma, Plaintiff denied cough, shortness of breath, fevers, chills, and was "tolerating her medicines without difficulty"; and that her hypercholesterolemia was "reasonably well controlled" based on blood tests. It was also reported on this date that a physical exam showed that Plaintiff was well developed and in no distress; that her lungs were clear; that her heart had regular rhythm; that she had normal gait and sat and stood without difficulty; that, pursuant to a foot exam, Plaintiff had "good pulses" and sensation was present in the dorsal and volar aspect; and that her lower extremities were without edema or varicosities. Tr. 253-54.

Plaintiff had an X-ray of her right ankle taken on November 6, 2006; the x-ray showed no evidence of acute osseous injury or joint abnormality. (Tr. 277).

Medical records reflect that Plaintiff was seen on December 9, 2006, and that, on this date,

Plaintiff's hypertension was uncontrolled; that, in regard to her hypertension, diet exercise and weight reduction were emphasized; that Plaintiff's GERD was stable by symptoms and exam; that her diabetes was under "reasonable control" with her regime of emphasizing diet, exercise, weight control, and medicine; that Plaintiff's hypercholesterolemia was "reasonably well controlled" and she was to continue the same diet, exercise and medications for this condition; that her asthma was stable; that Plaintiff reported feeling "frustrated" with her general health; that, in terms of her diabetes, Plaintiff had made "some effort at diet with fewer calories consumed" and "not much effort toward daily exercise"; that, in terms of cholesterol, Plaintiff was "making some effort on diet in reducing fact, some effort at exercise and [was] aware of the need to lose weight"; and that Plaintiff was well developed and in no distress. Tr. 249-50.

Dr. Brown saw Plaintiff on February 14, 2007, and reported on this date that Plaintiff said that the bottom of her feet bothered her, with pain located in the heel and arch, mostly when she was standing; that, on physical exam, Plaintiff had normal gait and sat and stood without difficulty; that Plaintiff wanted to try medication for her foot pain; that Plaintiff's diabetes was under "reasonable control"; that she would continue her regime of emphasizing diet, exercise and well control and medicine for her diabetes; that her asthma was stable; that her hypertension was "well controlled"; her GERD and degenerative arthritis were stable. Tr. 246.

On April 7, 2007, Dr. Brown reported that Plaintiff was seen, complaining of foot pain, swelling in the legs, and "fullness" in her left knee; that Plaintiff had normal gait; that she could sit and stand without difficulty; that Plaintiff's diabetes and hypercholesterolemia were under control; that her hypertension was uncontrolled; that Dr. Brown emphasized the need to control Plaintiff's diet and for her to lose weight in regard to her hypertension and other conditions; that Plaintiff did not meet guidelines for hypertension; that Dr. Brown re-emphasized the need for diet, exercise, and

weight reduction in regard to Plaintiff's hypertension; that Plaintiff's GERD was "stable by symptoms and exam"; that, in regard to her diabetes, Dr. Brown instructed Plaintiff to "continue the same regimen, emphasizing diet, exercise, [and] weight control as well as medicine if necessary"; that her hypercholesterolemia was "reasonably under control"; that her degenerative arthritis was stable; that Plaintiff said that her feet bothered her and that "Nuerontin did not help so she ha[d] made an appointment with a neurologist herself"; that Plaintiff was well developed and in no distress; that her lungs were clear; that her heart had regular rhythm; and that her lower extremities were without edema or varicosities. It was also reported on this date that Plaintiff weighed 236 pounds and her blood pressure was 138/70. Tr. 243-45.

K. Phillip Lee, M.D., reported, on April 25, 2007, that Plaintiff's "bilateral lower extremities showed no significant weakness except for slight toe flexion weakness"; that she had very "mild distal sensory loss in her toes"; that she complained of left wrist pain; that her hand strength was "intact"; that her deep tendon reflexes were "1+ bilaterally"; that bilateral peroneal and tibial motor nerve conduction studies showed" no significant abnormality"; that the left median and ulnar motor nerve conduction studies showed "no significant abnormality"; that bilateral sural sensory responses were within normal limits, pursuant to a nerve conduction test; the right medial plantar study was "difficult"; and that the impression was "no significant evidence for sensory motor neuropathy" and no left carpal syndrome. Tr. 212-13.

Records from St. John's Mercy Medical Center reflect that Plaintiff was admitted to the hospital, on May 7, 2007, for shortness of breath and that Plaintiff was discharged, on May 10, 2007, with instructions to follow-up if her condition changed. The records further reflect that the Plaintiff had not been taking all of her medication for financial reasons; that, as a result, Plaintiff presented with congestive heart failure secondary to elevated blood pressure; that Plaintiff had accelerated

hypertension and needed to be restarted on all her medication; that Plaintiff's congestive heart failure could be addressed with Lasix; that Plaintiff needed an echocardiogram and a cardiologist consult to adjust her medications down to a more affordable level. Tr. 176-78.

The impression from a May 8, 2007 chest x-ray was no acute abnormality and no interval change. Tr. 180. The report from a May 9, 2007 echocardiogram states that the "overall left ventricular systolic function was normal"; that the left ventricular ejection fraction was 55%; that the left ventricular wall thickness was "moderately increased"; that there was "mild mitral valvular regurgitation"; that the left atrium was "mildly dilated"; that the right ventricular size was normal; and that the right ventricular systolic function was normal. Tr. 183-85.

Kurt W. Kaufman, C.P.M., reported that Plaintiff presented to him on May 14, 2007, complaining of chronic bilateral foot pain and leg pain present for more than three months; that Plaintiff said she has this pain when she stands; that Plaintiff did not report having pain when she was off her feet; that neuropathy had previously been ruled out; that Plaintiff reported that she had begun to limp; and that Plaintiff had a diagnosis of "probable talonavicular joint arthritis bilaterally." Tr. 207.

Dr. Brown reported, on May 18, 2007, that Plaintiff was seen for follow-up after being hospitalized for elevated blood pressure caused by skipped medications; that no abnormalities were found during the physical exam; that hypertension is uncontrolled; that, in regard to her hypertension, Plaintiff's Prazosin was increased and the need for diet, exercise, and weight reduction was re-emphasized; that Plaintiff reported that she "still ha[d] pins and needles quivering sensation in her right foot and at night she [got] shooting type pain"; that Plaintiff's GERD was stable; that, in regard to her GERD, Plaintiff denied heartburn, indigestion, and difficulty swallowing; that, in terms of hypertension, Plaintiff denied chest pain or pressure, shortness of breath, and had no pedal edema; that her hypercholesterolemia was "well controlled"; that, in terms of cholesterol, Plaintiff was

making "some effort on diet," and "some effort toward daily exercise"; that her diabetes was under "reasonable control"; that her asthma was stable and she was to continue the same regimen for this condition; that, "in terms of [] depression," Plaintiff was "doing well"; that Plaintiff had normal gait and could sit and stand without difficulty; and that her lower extremities were without edema or varicosities. Tr. 239-40.

Dr. Kaufman reported, on May 22, 2007, that a bone scan showed "arthritic changes consistent with the medial and lateral cuneiforms bilateral" and that an MRI also showed bone marrow edema in the calcaneus and medial cuneiform; that Plaintiff was immobilized with a Cam walker for these conditions; that she was to stay off her feet at all times and return in four weeks; and that "it [was] very incumbent on [Plaintiff] to try and reduce her weightbearing as this [would] keep her inflamed." Tr. 207.

Dr. Kaufman reported, on June 19, 2007, that Plaintiff presented on this date for continued right foot pain; that Plaintiff said that she felt better when wearing her boot, that she had "discomfort" when not wearing her boot, and that she shooting pains down her leg at night; that, on palpating the foot, Plaintiff had "much less pain"; that there was no swelling in the foot; that x-rays taken on this date showed "a small lesion which could be consistent with mild avascular necrosis and/or continued osteochondral defect"; that Plaintiff should be scheduled for a bone stimulator and should follow-up with her back doctor; that Dr. Kaufman had instructed Plaintiff to wear the boot full time; that Plaintiff presented on that date in tennis shoes and Dr. Kaufman did not think she was wearing the boot as much as possible; and that Plaintiff was instructed to wear the boot at all times and to continue with decreased weightbearing. Tr. 207-208.

Records reflect that Dr. Brown saw Plaintiff on June 21, 2007; that Plaintiff weighed 240 pounds; that her blood pressure was 172/102; that Plaintiff had a normal gait; that she could sit and

stand without difficulty; that she had no clubbing, cyanosis or ischemic changes peripherally; that Plaintiff's hypertension was currently uncontrolled; that, in regard to her hypertension, Plaintiff did not complain of chest pain or pressure, palpitations or shortness of breath; that, in regard to her hypertension, Plaintiff was placed back on her medications and told to emphasize diet, exercise and weight reduction; that Plaintiff's diabetes was "reasonably" controlled; that, in regard to her diabetes, Plaintiff was told to continue her regimen emphasizing diet, exercise, and weight control "as well as medicine if necessary"; that Plaintiff's depression was not well controlled and she was given samples of Effexor; that Plaintiff's restless leg syndrome was helped by Requip; that Plaintiff's hypercholesterolemia was "reasonably well controlled" based on blood tests; that Plaintiff's asthma and GERD were stable; that, in regard to Plaintiff's GERD, she was to continue the regimen of encouraging weight reduction, smaller meals, not reclining afer a meal or eating within four hours of bedtime, and medications; that, in regard to Plaintiff's hypercholesterolemia, Plaintiff was to continue the "same diet, exercise and medications"; that, in regard to her asthma, Plaintiff denied cough, shortness of breath, and was tolerating her medications "without difficulty"; that Plaintiff's lungs were clear; that she was well developed and in no distress; that her heart had regular rhythm; and that Plaintiff's lower extremities were without edema or varicosities. Tr. 236-38.

Dr. Brown's records reflect that Plaintiff was seen on July 27, 2007. Records of this date reflect Plaintiff's body mass index was more than thirty; that Plaintiff was "a little discouraged" about having to wear a boot on her right foot; that Plaintiff denied having chest pain or pressure, palpitations, shortness of breath at rest, and trouble breathing with activity; that she had no pedal edema; that Plaintiff denied having cough, fever, chills; that Plaintiff was tolerating her asthma medication "without difficulty; that, in regard to her diabetes, Plaintiff denied having excessive thirst, excessive urination, and low blood sugar episodes; that Plaintiff was "making some effort at diet with

fewer calories consumed," based on blood tests; that Plaintiff's GERD was stable by symptoms and exam; that, in regard to her GERD, Plaintiff denied heartburn, indigestion or difficulty swallowing; that, in regard to her cholesterol level, Plaintiff was "making some effort in reducing fat, some effort at exercise and aware of the need to lose weight"; that Plaintiff's depression was stable and she should continue the same regimen; that Plaintiff's depression was "stable" and she was to continue the same regimen for this condition; that, on physical examination, Plaintiff was well-developed and in no distress, her lungs were clear, she had normal gait, sat and stood without difficulty, and had no clubbing, cyanosis or ischemic changes peripherally; and that a foot exam showed "good pulses, sensation present dorsal and volar aspect," and no erythema, callouses, or open areas. Tr. 234-36.

Peter Yoon, M.D. reported, on August 15, 2007, that Plaintiff presented complaining of recurrent lower right back pain for the past five months; that Plaintiff said that the pain was similar to what she experienced prior to surgery; and that she may have a recurrent disk herniation at the same area. Tr. 312-13.

An August 17, 2007 MRI showed "a broad, mild foraminal bulge of the L4-L5 intervertebral disc to the right which [did] mildly narrow the foramen"; that "[t]here [was] evidence of enhancing scar at the posterior aspect of the L4-5 intervertebral disc"; that "the vertebral bodies and intervertebral disc [were] otherwise normally aligned and of normal intensity"; that "[t]here [was] no other evidence of posterior disc herniation"; that the foramina [were] otherwise patent and symmetrical"; and that the "bony spinal canal [was] normal in size." Tr. 314.

On August 21, 2007, Dr. Yoon prescribed physical therapy for Plaintiff. Tr. 316.

Dr. Brown reported, on September 25, 2007, that Plaintiff presented complaining that her back was bothering her "quite a bit"; that Dr. Yoon had tried cortisone injections and they did not help; that Dr. Yoon was "talking about a myelogram"; that Plaintiff's depression was "not well

controlled"; that Plaintiff wanted to try something other than Effexor for her depression and Dr. Brown gave her Zoloft; that Plaintiff wanted more Requip because this medication helped her restless leg syndrome; that Plaintiff's hypertension was uncontrolled; that, in regard to her hypertension, Plaintiff denied chest pain or pressure, shortness of breath, and pedal edema; that her asthma was stable and she tolerated her asthma medicines without difficulty; that her diabetes was under "reasonable control" "so she [would] continue the same regimen, emphasizing diet, exercise, weight control as well as medicine if necessary"; that, in regard to her diabetes, Plaintiff denied excessive thirst, and symptomatic low blood sugar episodes, and was "making some effort at diet with fewer calories consumed, not much effort toward daily exercise"; that Plaintiff's GERD was stable by symptoms and examination and she would continue the same regimen for this condition; that Plaintiff's hypercholesterolemia was "reasonably well controlled" based on blood tests and she would continue the same diet, exercise and medications for this condition; and that Plaintiff weighed 243 pounds and her blood pressure was 148/100. Tr. 347-49.

On October 9, 2007, upon Dr. Yoon's request, Plaintiff had a CT of the lumber spine with contrast and a lumbar myelogram performed. The myelogram showed that the *lumbar spine was normally aligned*; that there were anterior extradural defects at multiple levels; and that there was no obstruction to flow of the myelographic contrast. The report from these tests also states that, at L1-2, the *disc had normal configuration, the facets were normal, and there was no central canal or foraminal stenosis*; that, at L2-3, there was "*mild bulging of the disc*, asymmetric to the right," and the *facet joints were unremarkable*; that, at L3-4, there was "mild bulging of the disc, asymmetric to the left," that this caused "*slight narrowing* of the left lateral corner of the thecal sac and left foramen," and that there was "*no central canal stenosis*"; that, at L4-5, there was a generalized disc bulge, the central canal was not stenotic, and there was a fracture through the inferior articular

process of L4, which extended to the facet joint; and that, at L5-S1, there was a rudimentary disc due to sacralization of L5 and no central canal or foraminal narrowing. The opinion was sacralized L5 vertebrae, "persistent soft tissue in the anterior epidural space on the right that slightly compresse[d] the traversing right L5 nerve sheath," and "fracture through the inferior articular process of L4 on the right that communicate[d] with the facet joint." Tr. 318-19.

Dr. Yoon reported, on October 10, 2007, that Plaintiff's myelogram did not show "any significant impingement especially on the right side"; that there might "be some post operative changes, but as far as [he could] see the impingement [was], at best, very mild"; that he did think that they "should do any surgical intervention"; that he talked with Plaintiff about "options including weight loss and exercises"; and that he would see Plaintiff "back with any persistent pain." Tr. 320.

Records reflect that on November 27, 2007, Plaintiff weighed 246 pounds and her blood pressure was 152/94. Tr. 350.

Plaintiff saw Dr. Brown again on December 4, 2007, to assess her multiple medical problems. The records of this date reflect that Plaintiff had stopped using her CPAP machine; that Dr. Brown instructed Plaintiff to follow-up with the company to get a more comfortable fit because she "need[ed] to be on the CPAP"; Plaintiff's diabetes was under "reasonable control so [she would] continue the same regimen"; her hypercholesterolemia was "reasonably well controlled"; that her depression and asthma were stable and she was to continue the same regimen for these conditions; that Plaintiff complained that her GERD was making her feet puffy; that Plaintiff's GERD was stable by symptoms and exam and she was to continue the same regimen for this condition; that she was well developed and in no distress; that her heart had regular rhythm; that, "in terms of sleep apnea," Plaintiff "seem[ed] to be sleeping fairly well, tolerating mask set up, feels rested in the morning and not falling asleep abruptly in the middle of the day," and was not "experiencing any chest pain or

shortness of breath"; and that "in terms of cholesterol, [Plaintiff] was making some effort on diet in reducing fat, some effort at exercise and [was] aware of the need to lose weight." Tr. 351-52.

Plaintiff was seen by Dr. Brown on February 5, 2008. Records of this date reflect that Plaintiff weighed 245 pounds and her blood pressure was 144/88; that Plaintiff reported that she was having trouble "smelling things," that her back was breaking out, that she was having trouble eating, and that she could eat ice cream, milk and cookies; that she had normal gait; that she sat and stood "without difficulty"; that she was well developed and in no distress; that her heart had regular rhythm; that Plaintiff's depression was "doing well"; that her hypertension was uncontrolled and that the need for diet, exercise, and weight reduction for this condition was "re-emphasized"; that her asthma was stable; that her medication for GERD was changed to Aciphex; that her diabetes was under "reasonable control" so she was to "continue the same regimen of emphasizing diet, exercise, weight control as well as medicine if necessary"; that her hypercholesterolemia was reasonably well controlled; and that her degenerative arthritis was stable. Tr. 354-55.

Dr. David Brown reported that Plaintiff presented on April 19, 2008. Records of this date reflect that Plaintiff said that her "feet [were] really bothering her"; that Plaintiff said that she had gone to a podiatrist who had tried to put her in [a] special boot" and she was not "too happy with it"; that Dr. Brown told Plaintiff that problem with her feet was "peripheral neuropathy secondary to diabetes that probably [would] not go away anytime soon"; that Plaintiff's hypertension was "well controlled"; that her asthma was stable; that her GERD was stable by symptoms and exam; that her diabetes was under "reasonable control"; that her hypercholesterolemia was "reasonably well controlled"; that Plaintiff would continue the same regimens for her GERD, diabetes, hypertension, and hypercholesterolemia; that Plaintiff was given medication for peripheral neuropathy; and that Plaintiff weighed 243 pounds and her blood pressure was 130/82. Tr. 356-58.

Plaintiff presented to Dr. Brown on June 26, 2008. Records of this date reflect that Plaintiff weighed 241 pounds and her blood pressure was 128/78; that Plaintiff said that her "right foot was still bothering her in the arch," that she had gotten an injection from her podiatrist, and that it had not "helped a lot"; that Plaintiff's foot exam showed "good pulses, sensation present dorsal and volar aspect" and "[n]o erythema, no callouses and no open areas"; that Plaintiff had normal gait; that she sat and stood "without difficulty" and had "no clubbing, cyanosis or ischemic changes peripherally"; that the Plaintiff's asthma was stable; her hypertension "appeare[d] to be well controlled" and she would continue her same regimen for this condition; that her GERD was stable and she would continue the same regimen for this condition; that her diabetes was under "reasonable control" and she would continue her same regime of diet, exercise, weight control, and medication for this condition; that her hypercholesterolemia was "reasonably well controlled" and she would continue her same regimen for this condition; that she had no new joint pains in regard to her degenerative arthritis; that she was well developed and in no distress; that her lungs had "slightly decreased breath sounds without wheezing, rhonchi, rates or rubs." Tr. 359-61. Plaintiff's hemoglobin test of this same date showed that Plaintiff's hemoglobin was 5.8%, with less than 6% being non-diabetic. Tr. 374.

Plaintiff had a x-ray of the skull on August 13, 2008. Tr. 375.

On September 12, 2008, Plaintiff presented to Dr. Brown. Records of this date reflect that Plaintiff said that her feet were "still bothering her" and she "wanted a new podiatrist"; that Plaintiff had a normal gait and sat and stood "without difficulty"; that her lungs were clear; that her heart had regular rhythm; that her diabetes was under "reasonable control" and she would continue the same regimen; that her GERD was stable and she denied heartburn, indigestion, and difficulty swallowing; that her hypertension "appeare[d] to be well controlled"; that her asthma was stable; and that Plaintiff was referred to Dr. Holtzman for her foot problem. Tr. 363-64.

Plaintiff presented to Dr. Brown on November 17, 2008. Records of this date reflect that Plaintiff's hypertension "appear[ed] to be well controlled"; her diabetes "appear[ed] to be under reasonable control"; that her hypercholesterolemia was "reasonably well controlled"; that her GERD and asthma were stable; that, in terms of cholesterol, Plaintiff was making "some effort on diet in reducing fat, some effort at exercise and aware of the need to lose weight"; that Plaintiff had normal gait; that she sat and stood "without difficulty"; that, in terms of asthma, Plaintiff denied cough, shortness of breath, fevers, and chills and was "tolerating the medicines without difficulty"; that, in terms of GERD, Plaintiff denied heartburn, indigestion, and difficulty swallowing. Tr. 367. Either on November 14 or 17, 2008, Plaintiff weighed 251 pounds and her blood pressure was 144/90. Tr. 365.

December 10, 2008 records from St. John's Mercy reflect that Plaintiff presented in the emergency room on this date with cough, congestion, bronchitis, and chest pain and that Plaintiff's medication was adjusted and she was given a Z-pack. Tr. 368.

Records reflect that, on December 15, 2008, Dr. Holtzman performed, on Plaintiff's right foot, a "decompression of the posterior tibial nerve" and a plantar fasciitis and that Plaintiff tolerated the procedure and anesthesia well. Tr. 308-309.

Dr. Holtzman's records reflect that Plaintiff was seen on December 23, 2008, one week after her surgery; that no signs or symptoms of infection were noted; that there was "no redness and minimal swelling"; that Plaintiff was placed on a pneumatic CAM walker; that Plaintiff was instructed "to remain nonweightbearing"; that Plaintiff was "somewhat confused about this"; that Plaintiff had been walking on her splint; and that Dr. Holtzman "inform[ed] her it [was] important not to ambulate on [her foot]." Tr. 304.

Dr. Holtzman saw the Plaintiff on January 7, 2009. Records of this date reflect that Plaintiff

had gone to the emergency room for calf pain; that an ultrasound was negative for DVT and positive for Baker cyst; Dr. Holtzman removed Plaintiff's sutures; that Plaintiff "look[ed] good"; that there were no signs or symptoms of infection; that Plaintiff had "been walking in her CAM walker even though she was instructed not to"; that she could "now walk in the CAM walker"; that she had "some pain within this area with palpation"; and that Dr. Holtzman believed Plaintiff had this pain "because she ha[d] been fairly noncompliant." Tr. 305.

Dr. Holtzman reported, on January 23, 2009, that Plaintiff said she was having "extreme pain in the back of her calf"; that she had this pain for the prior three weeks; that Plaintiff had a Doppler which was negative for DVT and negative for Baker cyst; that Dr. Holtzman thought the boot was aggravating the pain in Plaintiff's foot; that Dr. Holtzman was going to take Plaintiff out of the boot and put her in a shoe a "few days early; that Plaintiff had "virtually no pain around the incision site"; and that Plaintiff was given a prescription for Percocet due to pain. Tr. 306.

On February 13, 2009, Plaintiff told Dr. Holtzman that she did not think the surgery was working. Records of this date further reflect that Plaintiff said that she twisted her ankle; that she had a "chip fracture distal aspect of the fibula, very-very small in nature"; that Plaintiff was placed in a Trilock ankle brace until she got into her CAM walker; that Dr. Schwartz had prescribed physical therapy for Plaintiff due to muscle atrophy; that Dr. Holtzman wrote a prescription for therapy to decrease edema; and that Plaintiff had negative Tinel sign and no plantar fascial pain. Tr. 307.

Dr. Brown reported, on February 16, 2009, that Plaintiff said she had a foot operation and "then she hurt her other ankle because she was supporting the other foot so she [was] going to physical therapy for that"; that Plaintiff had not been using her Advair and had been "running low on her Albuterol, so her breathing [was] bothering her"; that her asthma was stable and she was put back on Advair and her Albuterol was renewed; that Plaintiff was going to physical therapy; that her

asthma and GERD were stable; her diabetes was under "reasonable control" and she would continue her regimen for this condition; that her hypercholesterolemia was "reasonably well controlled" and should would continue her regimen of diet, exercise, and medications for this condition; and that she had normal gait, could sit and stand without difficulty; that she was well developed and in no distress; and that her lungs were clear. Tr. 370-71.

Plaintiff had a normal x-ray of the right shoulder on March 9, 2009. Tr. 377.

In a letter to Dr. Holtzman, dated April 7, 2009, Lizette Alvarez, M.D., stated that she saw Plaintiff for an electrodiagnostic examination. Dr. Alvarez reported in this letter that a physical examination revealed that Plaintiff was in no acute distress; that she had bilateral ankle edema; that her range of motion was in functional limits; that Plaintiff had "discomfort with palpitation of the calcaneal tubercle and along the medial aspect of the sole of the right foot"; that Plaintiff had a well-healed incision; that her strength was normal throughout; and that she had a tingling sensation in the tips of two toes on her right foot. Dr. Alvarez further stated that she had performed electrodiagnostic studies of Plaintiff right lower extremity; that the right peroneal motor nerve conduction study showed normal distal latency, CMAP amplitudes, and normal conduction velocity across the leg; that the right tibial motor nerve conduction study showed a normal distal latency, CMAP amplitudes, and conduction velocity across the leg; the right sural antidromic sensory nerve conduction study showed a normal peak latency and amplitude; that the right medial and lateral plantar orthodromic nerve conduction studies showed no responses; that needle examination of selected muscles of the right lower extremity showed increased insertional activity and spontaneous activity in the abductor hallucis and the tibialis anterior, EDB, and ADM were normal; and that the impression was that there was "electrodiagnostic evidence consistent with a right tarsal tunnel syndrome as evidence by the absence of the medial and lateral plantar responses and by the spontaneous activity in the AH." Tr.

379-80.

### III.
### LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § § 416.920(f), 404.1520(f). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person's with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)

("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); <u>Charles v. Barnhart</u>, 375 F.3d 777, 782 n.5 (8th Cir. 2004) (holding that the at Step 5 the burden of production shifts to the Commissioner, although the Commissioner is to required to reestablish the RFC which the claimant must prove at Step 4).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. <u>Clark v. Heckler</u>, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002). In <u>Bland v. Bowen</u>, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

<u>Id</u>. at 535. <u>See also</u> <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994); <u>Turley v. Sullivan</u>, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. <u>McClees v. Shalala</u>, 2 F.3d 301, 302 (8th Cir. 1994); <u>Murphy v. Sullivan</u>, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001) (citing <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)). <u>See also</u> <u>Onstead v. Sullivan</u>, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial

evidence"). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving

that he has a disabling impairment. 42 U.S.C. § 423(d)(1); <u>Pickner v. Sullivan</u>, 985 F.2d 401, 403 (8th Cir. 1993); <u>Roach v. Sullivan</u>, 758 F. Supp. 1301, 1306 (E.D. Mo. 1991).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

<u>Baker v. Sec'y of Health and Human Servs.</u>, 955 F.2d. 552, 555 (8th Cir. 1992); <u>Polaski</u>, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. <u>Id.</u> The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. <u>Id.</u>; <u>Cruse</u>, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738 (8th Cir. 2004); <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841(8th Cir. 1992); <u>Ricketts v. Sec'y of Health and Human Servs.</u>, 849 F.2d 661, 664 (8th Cir. 1990); <u>Jeffery v. Sec'y of Health and Human Servs.</u>, 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he

considered all of the evidence. <u>Robinson</u>, 956 F.2d at 841; <u>Butler v. Sec'y of Health & Human Servs.</u>, 850 F.2d 425, 426 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each <u>Polaski</u> factor." <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. <u>Id.</u> Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. <u>Rautio v. Bowen</u>, 862 F.2d 176, 179 (8th Cir. 1988); <u>Millbrook v. Heckler</u>, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. <u>Nevland</u>, 204 F.3d at 857 (citing <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. <u>Id</u>. The Commissioner has to prove this by substantial evidence. <u>Warner v. Heckler</u>, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. <u>Nevland</u>, 204 F.3d at 857.


# IV.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. <u>Onstead</u>, 962 F.2d at 804. Even if there is substantial

evidence that would support a decision opposite to that of the Commissioner, the court must affirm

his decision as long as there is substantial evidence in favor of the Commissioner's position.

Krogmeier, 294 F.3d at 1022.

Plaintiff alleged on her application for benefits that she was disabled due to congestive heart

failure, hypertension, diabetes, high cholesterol, gout, arthritis, restless leg syndrome, asthma, back

problems, and foot problems. Plaintiff testified at the hearing before the ALJ that she was forty-two

years old and lived with her husband and a minor child; that she finished high school; that she had

worked at cashier jobs and for Social Services until 2004; that her weight at the time of the hearing

was 239 pounds and she was 5'2" tall; that she had surgery on her back in 2006 and that her back still

hurt her; that she had problems with her feet and congestive heart failure; that she had depression;

that she has a hard time keeping her blood pressure under control; and that she had diabetes and was

not on a diabetic diet; and that she had asthma and used an inhaler. Tr. 22-23, 25, 27-29, 32-33.

The ALJ considered that the Plaintiff claimed that she was disabled since March 9, 2007, that

Plaintiff's mental impairments had less than a minimal effect upon her ability to perform work-related

functions and were "non-severe" within the regulatory definition; that Plaintiff did have the severe

impairments of obesity, hypertension, hypercholesterolemia, diabetes mellitus, asthma, sleep apnea,

GERD, lumbar spondylosis requiring a laminectomy and microdiscectomy, and right tarsal tunnel

syndrome; that Plaintiff did not have an impairment or a combination of impairments that met or

medically equaled one of the listed impairments; that Plaintiff's diabetes symptoms failed to rise to

the level of significance required in the listing; that the Plaintiff failed to demonstrate she had

peripheral neuropathy; that her arthritis did not result in persistent inflammation or deformity; that

Plaintiff's foot conditions did not result in an inability to ambulate; that her back problems did not

show evidence of nerve root compression, spinal arachmoiditis or pseudo-claudication that resulted

in an inability to ambulate effectively; that Plaintiff had the RFC to lift ten pounds, stand or walk two hours out of an eight-hour workday, and sit six hours out of an eight-hour workday; that Plaintiff was not capable of performing her past relevant work; that there was work in the economy which a person with Plaintiff's RFC could perform; and that, therefore, Plaintiff was not under a disability within the meaning of the Act from March 9, 2007, through the date of decision.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to consider all of her medically determinable impairments; because the ALJ failed to articulate any rational with regard to Plaintiff's congestive heart failure; because the ALJ failed to articulate a legally sufficient reason for the conclusion that Plaintiff's restless leg syndrome and her depression did not rise to medically determinable impairments; because the ALJ failed to consider all of Plaintiff's medically determinable impairments when determining her RFC, including Plaintiff's back and foot problems; because the ALJ failed to properly consider Plaintiff's RFC under the standards contained in Singh v. Apfel, 223 F.3d 448 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2002); because there is no medical opinion evidence which reflects that Plaintiff is capable of sedentary work activity; because the ALJ failed to fully develop the record; and because the ALJ failed to obtain testimony from a VE.

A.      **Plaintiff's Medically Determinable Impairments:**

Plaintiff contends that the ALJ did not consider all of her medically determinable impairments. She further argues that the ALJ did not consider all the medical evidence and, in particular, that the ALJ did not provide sufficient rational when addressing her restless leg syndrome, congestive heart failure, and her depression.  To the extent that Plaintiff contends that the ALJ did not consider the medical evidence, Plaintiff is mistaken; the ALJ considered, in great detail, medical records which address each of Plaintiff's alleged medical impairments. In particular, the ALJ considered records

from Plaintiff's numerous visits to Dr. Brown, as set forth above. Tr. 14-16. The ALJ also considered, in great detail, medical records from Plaintiff's emergency room visits, and records from Dr. Yoon, Dr. Kaufman, Dr. Holtzman and Dr. Alvarez, as set forth above. Tr. 16-18. Although the ALJ did not individually address each and every one of Plaintiff's numerous alleged disabling conditions, he did address them as part of Plaintiff's overall condition upon her presentation to Dr. Brown. For example, the ALJ considered that, in November 2008, Plaintiff's "impairments were noted as well controlled."

In regard to Plaintiff's allegation of congestive heart failure, the ALJ considered the Plaintiff's testimony that she has congestive heart failure. The ALJ further considered that, on December 9, 2006, Plaintiff had "insignificant cardiac symptoms." Tr. 14 The ALJ also considered medical records related to Plaintiff's admission to St. John's Mercy on May 7, 2007, after she had shortness of breath; that findings suggested Plaintiff had congestive heart failure secondary to left ventricular dysfunction; that an echocardiogram on May 9, 2007, indicated Plaintiff's left ventricular ejection fraction was normal and her ejection fraction was normal at fifty-five percent; and that she was prescribed Lasix for this diagnosis. Tr. 15. The court notes that the May 9, 2007 echocardiogram showed that the right ventricular size and the right ventricular systolic function was *normal*; that there was *mild* mitral valvular regurgitation, and that the left atrium was *mildly* dilated. Also, hospital records reflect that Plaintiff's May 2007 congestive heart failure was secondary to elevated blood pressure and that she had *not been taking all of her medications* for financial reasons prior to this incident. Additionally, Dr. Brown reported on May 18, 2007, that Plaintiff had been hospitalized for elevated blood pressure caused by *skipped medications*. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain); Clark v. Shalala, 28 F.3d 828, 831 n.4

(8th Cir. 1994); <u>Riggins v. Apfel</u>, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a plaintiff's argument that he was unable to afford prescription pain medication, an ALJ may discredit complaints of disabling pain where there is no evidence that the claimant sought treatment available to indigents). In any case, it was recommended, while Plaintiff was hospitalized in May 2007, that she have a cardiologist consultation to adjust her medications to a more affordable level.

To the extent Plaintiff's congestive heart failure was secondary to elevated blood pressure, the ALJ considered that, on July 27 and December 4, 2007, and on April 19, 2008, Plaintiff had no significant symptoms related to her hypertension; that, on February 5, 2008, Plaintiff's hypertension was uncontrolled; that on November 17, 2008, her hypertension was well controlled; and that Plaintiff's hypertension did not result in complications such as let ventricular failure, athrerosclerotic heart disease, vascular incidents, or renal failure. Tr. 16-17. The court notes that, in June 2007, when Plaintiff's hypertension was reported as "uncontrolled," she had been off of her medication and she, nonetheless, did not complain of chest pain or pressure, palpitations, or shortness of breath. Tr. 237. When Plaintiff's blood pressure was reported as uncontrolled in February 2008, Dr. Brown emphasized the need for diet, exercise, and weight reduction. See <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment is inconsistent with complaints of disabling pain); <u>Clark v. Shalala</u>, 28 F.3d 828, 831 n.4 (8th Cir. 1994). Subsequently, Dr. Brown reported, in April 2008, that Plaintiff's hypertension was "well controlled" with her regimen. Conditions which can be controlled by treatment are not disabling. <u>See Harris v. Heckler</u>, 756 F.2d 431, 435-36 n.2 (6th Cir. 1985). <u>See also Murphy v. Sullivan</u>, 953 F.2d 383, 384 (8th Cir. 1992); <u>Warford v. Bowen</u>, 875 F.2d 671, 673 (8th Cir. 1989) ( holding that a medical condition that can be controlled by treatment is not disabling); <u>James for James v. Bowen</u>, 870 F.2d 448, 450 (8th Cir. 1989). Additionally, in April 2008, Plaintiff's blood pressure was 130/82,

in June 2008, it was 128/78, and in November 2008, it was 144/90. See Murphy v. Sullivan, 953 F.2d

383, 384 (8th Cir. 1992) (holding that a high blood pressure reading of 170/90 indicates only

moderate hypertension); Brown v. Heckler, 767 F.2d 451, 453 (8th Cir. 1985) (holding that blood

pressure which measures within the range of 140-180/90-115 is considered mild or moderate, and

that hypertension does not qualify as severe where it does not result in damage to the heart, eye, brain

or kidney) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, 4.00 C).  The court finds that the

ALJ's consideration of Plaintiff's congestive heart failure and hypertension is based on substantial

evidence and that it is consistent with the Regulations and case law.

To the extent the ALJ did not specifically address Plaintiff's restless leg syndrome, the ALJ's

failure to do so does not mean that he did not consider it. See Montgomery v. Chater, 69 F.3d

273,275 (8th Cir. 1995).  See also Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) ("The fact

that the ALJ did not elaborate on this conclusion does not require reversal, because the record

supports her overall conclusion.") (citations omitted);  Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th

Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not

required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific

evidence does not indicate that such evidence was not considered").  In any case, Plaintiff told Dr.

Brown, on June 21, 2007, and on September 25, 2007, that Requip helped her restless leg syndrome.

See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009) (conditions which can be controlled with

medication are not disabling); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if

an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart,

275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen,

875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by

treatment is not disabling); James, 870 F.2d at 450.  Therefore, assuming arguendo, that the ALJ did

not consider Plaintiff's restless leg syndrome, this failure did not have an effect on the outcome of this matter. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

To the extent Plaintiff contends that the ALJ did not articulate a legally sufficient rationale for finding that Plaintiff's depression did not rise to the level of medically determinable condition, the ALJ did consider that Plaintiff's medical records indicated that she took medication for her mental impairments and that she was not seeing a mental health professional. Dr. Brown, who is not a psychiatrist and who was Plaintiff's primary care physician, prescribed medication for Plaintiff's self-reported depressive symptoms. As stated above, seeking limited medical treatment for an alleged disabling condition is inconsistent with claims that the condition is disabling. See Rautio, 862 F. 2d at 179; Edwards, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [Plaintiff] would have sought regular medical treatment."); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("[Claimant's] failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits."); Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). Moreover, Plaintiff does not suggest that she could not afford medical care for depression. When Plaintiff's depression was not controlled, in June 2007, she was given Effexor; in July 2007, Plaintiff's depression was "stable"; in September 2007, when her depression was not well controlled, Dr. Brown switched Plaintiff's medication to Zoloft; and, in February 2008, Dr. Brown reported that Plaintiff's depression was "doing well." Thus, when Plaintiff took Zoloft, her depression was better. See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered

disabling);Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. The court finds that the ALJ's consideration of Plaintiff's depression is based on substantial evidence and that it is consistent with the Regulations and case law.

The ALJ also considered, in regard to Plaintiff's feet, that Plaintiff saw Dr. Kaufman for her podiatry-related impairments; that she complained of foot pain on May 14, 2007; that Plaintiff's allegation of foot pain is inconsistent with Dr. Brown's records which indicate that she had no limitations in her gait; that an electromyogram in April 2007 ruled out neuropathy; that Dr. Kauffman reported that Plaintiff's deep tendon reflexes and sensorium were intact; and that Plaintiff was diagnosed with talonavicular joint arthritis. The ALJ further considered that a May 15, 2007 bone scan of Plaintiff's feet ruled out stress fracture; that Dr. Kauffman prescribed a boot; and that he indicated that Plaintiff might not have been wearing the boot as much as possible. The ALJ considered Plaintiff's December 2008 foot surgery; that, on December 23, 2008, after surgery, Plaintiff did not have signs of infection and had no calf pain with palpation; that Plaintiff continued to improve after surgery; that in January 2009 she was using a CAM walker and was non compliant; that she subsequently had a chip fracture; and that Dr. Alvarez's April 7, 2009 examination did not demonstrate significant strength limitation or atrophy and that it showed that Plaintiff had normal strength throughout. Tr. 17-18. Most significantly, the court notes that Dr. Brown reported, repeatedly, that Plaintiff could sit and stand, without difficulty, and that she was well developed and in no distress.

The ALJ also concluded that the Plaintiff's arthritis did not result in persistent inflammation or deformity, and that, therefore, she did not meet or equal listing 14.09. Further, the ALJ found that

Plaintiff's symptoms did not result in an inability to ambulate as required by 20 C.F.R. §§ 404.1525 and 404.1526.

The ALJ also considered records relevant to Plaintiff's lumbar spondylosis and right tarsal tunnel syndrome. In particular, the ALJ considered that, repeatedly, during the relevant period, it was reported that Plaintiff had normal gait and that she could sit and stand without difficulty. The ALJ noted that Plaintiff's requiring surgery underscored that her spinal impairments were significant. The ALJ considered, however, that Plaintiff's symptoms were less significant after both back surgery and surgery for her right tarsal tunnel syndrome and plantar fasciitis. In this regard, the ALJ noted that on December 23, 2008, Dr. Holtzman observed no signs or symptoms of infection and no calf pain on palpation; that on January 7, 2009, Plaintiff was reported as doing well; and that in April 2009, she had normal strength throughout. Tr. 17-18. See Medhaug, 578 F.3d at 813; Schultz, 479 F.3d at 983; Estes, 275 F.3d at 725; Murphy, 953 F.2d at 384; Warford, 875 F.2d at 673; James, 870 F.2d at 450. The court finds that the ALJ's consideration of Plaintiff's lumbar spondylosis, right tarsal tunnel syndrome, disability related to her feet, and her arthritis is based on substantial evidence and that it is consistent with the Regulations and case law.

In regard to Plaintiff's sleep apnea, GERD, hypercholesterolemia, and asthma, the court notes that Dr. Brown repeatedly reported that they were under control and/or stable. See Medhaug, 578 F.3d at 813; Schultz, 479 F.3d at 983; Estes, 275 F.3d at 725; Murphy, 953 F.2d at 384; Warford, 875 F.2d at 673; James, 870 F.2d at 450. As noted by the ALJ, Dr. Brown reported, in December 2007, that Plaintiff was *not using her CPAP* for sleep apnea and, in February 2009, when Plaintiff's asthma bothered her she was *not using Advair*. As stated above, failure to comply with prescribed medical treatment is inconsistent with complaints of disabling pain. See Brown, 87 F.3d at 965. Even, in February 2009, when she had not taken medication, Dr. Brown reported that Plaintiff's

asthma was stable. Additionally, the ALJ considered, in regard to Plaintiff's asthma, that the records did not contain evidence of spirometry tests which revealed persistent and significantly deficient forced expiration capabilities and did not reflect that Plaintiff repeatedly visited the emergency room as a result of asthma. Tr. 15. The court finds that the ALJ's consideration of Plaintiff's GERD, hypercholesterolemia, and asthma is based on substantial evidence and that it is consistent with the Regulations and case law.

In regard to Plaintiff's obesity, the ALJ considered that Dr. Brown reported in July 2007 that Plaintiff's BMI was greater than thirty, which indicates obesity; that there was no evidence that Plaintiff's obesity was accompanied by significant degenerative joint disease or degenerative disc disease; and that there was no evidence that her obesity caused reduced respiratory capacity, skin disorders, extensive edema. The ALJ considered the effect of Plaintiff's obesity on the combination of her impairments. He further considered that the records repeatedly stress the importance of Plaintiff's losing weight and exercising more frequently and that the record does not reflect that Plaintiff was compliant with these recommendations. Tr. 16.

In regard to obesity, 20 C.F.R., Pt. 404, Subpt. P, App. 1, 1.00, Q, states:

Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

Social Security Ruling ("SSR") 02-01p, 2000 WL 628049, at *2-5 (Sept. 12, 2002), states, in relevant part, that:

Obesity is a complex, chronic disease characterized by excessive accumulation of body fat. Obesity is generally a combination of factors (e.g., genetic, environmental,

and behavioral).   .   .   .

> We will consider obesity in determining whether:
> The individual has a medically determinable impairment. . . .
> The individual's impairment(s) is severe. . . .
> The individual's impairment(s) meets or equals the requirements of a
> listed impairment in the listings. . . .
> The individual's impairment(s) prevents him or her from doing past
> relevant work. . . .

> If an individual has the medically determinable impairment obesity that is
> "severe" as described [above], we may find that the obesity medically equals a listing.
> . . . We may find in a title II claim, or an adult claim under title XVI, that the obesity
> results in a finding that the individual is disabled based on his or residual functional
> capacity (RFC), age, education, and past work experience. However, we will also
> consider the possibility of coexisting or related conditions, especially as the level of
> obesity increases.   .   .   .

> There is no specific weight or BAI that equates with a "severe" or a "not
> severe" impairment.   . . . Rather, we will do an individualized assessment of the
> impact of obesity on an individual's functioning when deciding whether the
> impairment is severe. . . .

> Because there is no listing for obesity, we will find that an individual with
> obesity may meet the requirements of a listing if he or she has another impairment
> that, by itself, "meets" the requirements of a listing. We will also find that a listing is
> met if there is an impairment that, in combination with obesity, meets the requirements
> of a listing. For example, obesity may increase the severity of coexisting or related
> impairments to the extent that the combination of impairments meets the requirements
> of a listing.

Upon considering the severity of Plaintiff's obesity and upon concluding that she was not

disabled, the ALJ did not dispute Plaintiff's allegation that she was obese. Rather, the ALJ

considered all Plaintiff's symptoms and medical records in light of her obesity, and concluded that the

combination of her impairments did not meet the requirements of a listing. Further, when determining

Plaintiff's RFC, the ALJ considered Plaintiff's obesity, in conjunction with other limitations which

he found credible. The court finds, therefore, that the ALJ's consideration of Plaintiff's obesity is

consistent with SSR 02-01p and that it is based on substantial evidence.

As stated by the Eighth Circuit, in regard to diabetes:

The listing for presumptively disabling diabetes requires a showing of a diabetes diagnosis with "[n]europathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. pt. 404, subpt. P, app. 1 § 9.08(A).

Cunningham v. Apfel, 222 F.3d 496, 502 n.8 (8th Cir. 2000).

In regard to Plaintiff's diabetes, the ALJ considered the medical records and, in particular, that Plaintiff's diabetes was not indicated to cause recurrent diabetic ketoacidosis; that there was no history of diabetic coma; and that Plaintiff did not have complications such as significant weight loss, deep ulcers, end-organ damage, cerebral vascular disease, coronary artery disease, congestive heart failure, neuropathy, retinopathy, peripheral vascular disease relating to her diabetes. Moreover, the court notes that Dr. Brown repeated reported that Plaintiff's diabetes was controlled, to some degree, or stable, with her regimen of diet and exercise and medicine, when necessary. As stated above, conditions which can be controlled with medication are not disabling. See Medhaug, 578 F.3d at 813; Schultz, 479 F.3d at 983; Estes, 275 F.3d at 725; Murphy, 953 F.2d at 384; Warford, 875 F.2d at 673; James, 870 F.2d at 450. The court finds that the ALJ's consideration of Plaintiff's diabetes is based on substantial evidence and that it is consistent with the Regulations and case law.

For the foregoing reasons, the court finds that the ALJ articulated legally sufficient reasons when finding that Plaintiff's congestive heart failure was not a severe impairment, and that he articulated sufficient reasons for finding that Plaintiff's restless leg syndrome and depression did not rise to the level of medically determinable impairments. To the extent the ALJ may not have articulated detailed reasons for finding why each of Plaintiff's alleged disabling conditions were not severe, not disabling, and/or did not meet a Listing, the court finds, because the record supports the ALJ's conclusions, that the court need not set aside the ALJ's decision. See Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a

sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."). Additionally, the court finds that the ALJ's consideration of the medical records, in conjunction with Plaintiff's testimony, is supported by substantial evidence on the record as a whole. In conclusion, the court finds that the ALJ's determination that Plaintiff had the severe impairments of obesity, hypertension, hypercholesterolemia, diabetes mellitus, asthma, sleep apnea, GERD, lumbar spondylosis requiring a laminectomy and microdiscectomy, and right tarsal tunnel syndrome and that her other alleged disabling conditions were not severe is supported by substantial evidence and that his decision, in this regard, is consistent with the case law and Regulations. The court further finds that the ALJ's determination that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled one of the listed impairments is supported by substantial evidence and that his decision, in this regard, is supported by the case law and Regulations.

**B.    Plaintiff's RFC:**

The ALJ found that Plaintiff had the RFC to engage in sedentary work, in that she can lift ten pounds and stand or walk two hours and sit six hours out of an eight-hour work day. 20 C.F.R. §§ 404.1567(a), 416.967(a) provides that sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary to carry out the duties of a sedentary job.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a

claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Anderson v. Shalala, 51 F.3d, 779 (8th Cir. 1995). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff, 421 F.3d at 790 (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At step 5, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at step 5, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id. In any case, "[a] disability claimant has the burden to establish [his or] her RFC." Eichelberger, 390 F.3d at 591 (citing Masterson, 363 F.3d at 737).

Plaintiff alleges that there is no evidence in the record that indicates she was capable of performing sedentary work because Plaintiff's complaints of severe disabling pain related to her lumbar spine and to her lower extremity foot conditions. Plaintiff also contends that the ALJ did not properly consider the medical evidence to determine her RFC because the decision failed to point to medical evidence to support the conclusion that Plaintiff would be capable of walking and/or standing up to two hours in an eight hour workday and failed to point to some medical evidence for the ALJ's

conclusions regarding Plaintiff's RFC. Plaintiff further contends that the ALJ's determination regarding Plaintiff's RFC is not consistent with the case law and Regulations.

Prior to determining Plaintiff's RFC, the ALJ considered Plaintiff's testimony. The ALJ also considered medical records from Dr. David Brown which consistently reflect that Plaintiff could sit and stand without difficulty, that she had a normal gait, that she was well developed, and that she was in no distress. The ALJ further considered that the record reflected that Dr. Brown reported no cyanosis, clubbing or ischemic changes peripherally; that records of Dr. Kaufmann, indicated that the Plaintiff was not compliant when she was prescribed a boot to address her foot pain; that Dr. Holtzman's records indicated that Plaintiff's foot problems improved following surgery; and that the Plaintiff had been non-compliant with instructions after her surgery and, on occasion, had been non-compliant with taking medications. The court notes that no doctor imposed lifting restrictions on Plaintiff. A record which contains no physician opinion of disability detracts from claimant's subjective complaints. See Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981). Additionally, in October 2007, the last time Plaintiff sought treatment for back pain, Dr. Yoon noted that tests did not show any significant impingement, and, on April 25, 2007, Dr. Lee reported that Plaintiff had, among other things, had no significant weakness in her lower extremities, except for slight toe flexion weakness, and that her hand strength was intact.

After considering the medical records and Plaintiff's testimony, the ALJ in the matter under consideration concluded that Plaintiff had the severe impairments of obesity, hypertension, hypercholesterolemia, diabetes mellitus, asthma, sleep apnea, GERD, lumbar spondylosis requiring a laminectomy and microdiscectomy, and right tarsal tunnel syndrome; that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled one of the listed

impairments; and that Plaintiff's diabetes symptoms failed to rise to the level of significance required in the listing. Only after reaching these conclusions did the ALJ determine Plaintiff's RFC. <u>See</u> <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations") (citing <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir.1995).

Upon making an RFC assessment, an ALJ must identify a claimant's functional limitations or restrictions, and then assess his or her work-related abilities on a function-by-function basis. <u>See</u> <u>Masterson</u>, 363 F.3d at 737; <u>Harris v. Barnhart</u>, 356 F.3d 926, 929 (8th Cir. 2004). The ALJ in the matter under consideration did so and limited Plaintiff's ability to stand or walk to only two hours and her ability to sit to six hours in an eight-hour work day.

The court finds that the ALJ's conclusion, that Plaintiff can engage in sedentary work, with the stated restrictions of standing or walking two hours and sitting six hours out of an eight-hour day, is consistent with his findings regarding the medical evidence and Plaintiff's testimony and that it is based on substantial evidence on the record. Moreover, the ALJ's determination of Plaintiff's RFC is precise as it directly addresses limitations resulting from the impairments which the ALJ found were severe and the requirements of sedentary work. Additionally, the ALJ's assessment of Plaintiff's RFC is based upon and is consistent with all of the relevant evidence. <u>See</u> <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations") (citing <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir.1995). In any case, as stated above, Plaintiff had the burden to establish disability and she did not provide evidence that she is disabled. In conclusion, the court finds that the ALJ determined

Plaintiff's RFC in a manner consistent with the Regulations and case law, including Lauer, 245 F.3d at 704, and Singh, 222 F.3d at 451, and that his decision, in regard to Plaintiff's RFC, is based on substantial evidence.

## C.     ALJ's Development of the Record:

Plaintiff alleges that the ALJ failed to develop the medical record and that the ALJ should have re-contacted her treating doctors for clarification regarding her ability to perform work functions.

An ALJ has a duty to fully and fairly develop the evidence. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) ("Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case") (citing Nevland, 204 F.3d at 858; Landess v. Weinberger, 490 F.2d 1187, 1188 (8th Cir.1974)); Brown v. Heckler, 827 F.2d 311, 312 (8th Cir. 1987); Brissette v. Heckler, 730 F.2d 548, 549 (8th Cir. 1984), Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). This duty extends to the ALJ even where a claimant is represented by counsel. Id. (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir.1983)). Specifically, "[w]hen a claimant's medical records do not supply enough information to make an informed decision, the ALJ must fulfill this duty by ordering a consultative examination." Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992); Dosier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985) (holding that "it is reversible error for an ALJ not to order a consultative exam when such an evaluation is necessary to make an informed decision"). See also, 20 C.F.R. § 416.917. Under the regulation governing consultative medical evaluations, a referral is necessary if the evidence of the record is insufficient to make a determination. See 20 C.F.R. §§ 404.1517 through 404.1519a. The issue, therefore, is whether there was sufficient evidence before the ALJ to permit him to make a determination with respect to Plaintiff's ability to engage in substantial gainful employment.

First, the court notes that the record contains detailed notes from Dr. Brown, in which Dr. Brown addressed each of Plaintiff's alleged impairments and provided a narrative as to their severity, treatment, and prognosis. The record also includes records of imaging and laboratory analysis, which, likewise, address the severity of Plaintiff's alleged impairments. Second, as discussed above, the court has found that the ALJ's decision regarding the severity of Plaintiff's impairments and his RFC determination are based on substantial evidence. Third, no crucial issue was left undeveloped. The court further finds that the record was sufficient for the ALJ to make a determination as to whether Plaintiff is disabled. Under such circumstances, the ALJ was not under an obligation to further develop the record. As such, the court finds that Plaintiff's argument that the ALJ did not fully develop the record and that he should recontact her doctors is without merit.

**D.    Vocational Expert Testimony:**

Plaintiff contends that the ALJ did not properly consider her non-exertional limitations and that the ALJ should have solicited the testimony of a VE. In the matter under consideration the ALJ relied upon the Medical-Vocational Guidelines to determine that there was work in the economy that a person with the Plaintiff's RFC could perform.

Resort to the Medical-Vocational Guidelines is only appropriate when there are no non-exertional impairments that substantially limit the ability of Plaintiff to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical-Vocational

Guidelines. See Robinson, 956 F.2d at 839. If, however, the claimant is also found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. See id. On the other hand, "'an ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines.'" Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997) (quoting Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988)).

SSR 83-10, 1983 WL 31251, at *1, clarifies the proper use of the Guidelines in the sequential analysis for determining whether a claimant is disabled and states in relevant part:

> [T]he fifth and last step in the process, the individual's residual functional capacity (RFC) in conjunction with his or her age, education, and work experience, are considered to determine whether the individual can engage in any other substantial gainful work which exists in the national economy. (See the glossary at the end of the policy statement for definitions of terms and concepts commonly used in medical-vocational evaluation--e.g., RFC.)

> To increase the consistency and promote the uniformity with which disability determinations are made at this step at all levels of adjudication, the regulations for determining disability were expanded in February 1979. Appendix 2 was provided to establish specific numbered table rules for use in medical-vocational evaluation.

SSR 83-10, 1983 WL 31251, at *6, defines a non-exertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, further defines non-exertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength

activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional restriction as an "impairment-caused need to avoid one or more environmental conditions in a workplace."

First, a review of the record establishes that substantial evidence supports the ALJ's decision that Plaintiff did not have non-exertional impairments, including depression and pain, which would preclude the ALJ's reliance upon the Guidelines. Second, sedentary work does not involve postural functions such as climbing, balancing, kneeling, crouching, or crawling. See SSR 96-9p. Third, as stated above, the ALJ limited Plaintiff's ability to sit and stand to two hours a day. Because substantial evidence supports the ALJ's decision that Plaintiff did not have a non-exertional impairment which limited her ability to perform substantial gainful activity, the ALJ was not required to utilize the assistance of a VE. See Reynolds, 82 F.3d at 258; Reed, 988 F.2d at 816; Sanders, 983 F.2d at 823. Plaintiff's argument, that the ALJ should have utilized the testimony of a VE, therefore, is without merit. See Robinson, 956 F.2d at 839.

## V.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint is **DENIED**; Docs. 1, 13,

**IT IS FURTHER ORDERED** that a separate judgment will be entered incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of February, 2011.